UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

A. FRANK DUNHAM, *et al.*,          :
                                    :
          Plaintiffs,               :
                                    :
     v.                             :  Civil Action No. 04-1993 (JR)
                                    :
MICHAEL H. HOLLAND, *et al.*,       :
                                    :
          Defendants.               :

**MEMORANDUM**

When trustees of the 1993 United Mine Workers of America (UMWA) Benefit Plan (1993 Plan) cannot agree on a question calling for interpretation of plan language, the Plan calls for them to resort to arbitration. In this case, the trustees for the coal-producing signatories to the 1993 Plan (Employer Trustees) disagreed with the trustees for the UMWA (Union Trustees) about whether Plan benefits were payable to certain retirees of the now-bankrupt BethEnergy Mines Corporation. Their dispute was submitted to arbitration, and the arbitrator ruled in favor of the Union Trustees. The Employer Trustees filed suit in this court, seeking reversal of the arbitrator's ruling. The parties filed cross-motions for summary judgment. On March 31, 2006, declining to disturb the arbitrator's decision on one of two disputed points but finding that his decision on the other point did not "draw[] its essence" from the parties' agreement, Steelworkers v. American Mfg. Co.,

363 U.S. 564, 597 (1960), I ordered each motion granted in part and denied in part.[1]  This memorandum explains that order.

## Background

### Multi-employer benefit plans

The original UMWA multi-employer benefit plan was established in 1946 to provide medical care to coal miners and their dependents.  That plan, and subsequent plans negotiated by UMWA and coal producers, was funded by payroll deductions and royalties paid by signatory coal producers, prorated according to the amount of coal each company produced.

In 1974, the multi-employer plan was divided into four separate plans: the 1950 and 1974 pension plans, and the 1950 and

---

[1] The order stated:

> For reasons to be set forth in an opinion to follow, the motion of Employer Trustees A. Frank Dunham and Elliot A. Segal for summary judgment [5] is granted as to Arbitrator Irvings's decision that BethEnergy is "no longer in business" if Massey is not legally obligated to provide health benefits to BethEnergy retirees at the High Power Mountain Preparation Plant and Eagle Nest Mine who never came to work for a covered Massey subsidiary and otherwise denied.  The motion of Union-Appointed Trustees Michael H. Holland and Marty D. Hudson for summary judgment [6] is denied as to Arbitrator Irvings' decision that BethEnergy is "no longer in business" if Massey is not legally obligated to provide health benefits to BethEnergy retirees at the High Power Mountain Preparation Plant and Eagle Nest Mine who never came to work for a covered Massey subsidiary and otherwise granted.

Ord. of March 31, 2005, Dunham, et al v. Holland et al, 04-1993 (JR).  The incorrect spelling of Arbitrator Irvings's name has been rectified in this memorandum.

1974 benefit plans.  In 1978, the parties agreed that thenceforth coal producers would provide health benefits to their own retirees as long as they stayed in business.  They agreed to continue the 1974 multi-employer benefit plan only to cover so-called "orphan" retirees, defined as retirees whose last employer is "no longer in business."  Over the next twelve years, the 1974 benefit plan ran large deficits, as employers manipulated corporate forms to fit the "no longer in business" test and "dumped" their employees onto the plan.

In the 1981 wage agreement, the coal producers and the UMWA addressed the employee "dumping" problem by specifying that an employer is "no longer in business" only if the employer:

>    (a)   has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operation will start up again; and
>
>    (b)   is financially unable (through either the business entity that has ceased operations as described in paragraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and non-pension benefits to its retired miners and surviving spouses.

Plaintiffs' Ex. 2 at 2-3.  The plan's trustees applied these twin elements, cessation of operations and financial inability to pay, as written, until two federal circuit courts decided that a retiree is still orphaned if a corporate successor, though having the financial ability to pay benefits, is free from any legal

obligation to do so.  See District 29, UMWA v. Royal Coal Co., 826 F.2d 280 (4th Cir. 1987); UMWA v. Nobel, 902 F.2d 1558 (3rd Cir. 1990).  The effect of those decisions was to bring thousands of new retirees within the framework of the 1974 plan and exacerbate the employee dumping problem.  The 1974 plan now faced liabilities far exceeding its assets, ultimately requiring federal intervention through the Coal Act of 1992, which provided benefits for miners retiring before September 30, 1994, but left the fate of miners retiring after that date to collective bargaining.

In the 1993 wage agreement, mindful of the Royal Coal and Nobel decisions, but believing that the plan's original language adopted in 1981 had appropriately defined when an employer was "no longer in business," the parties simply made clear their intent that the requirements of Article XX(c)(3)(ii) be applied as written, by adding the sentence:  "The parties expressly intend that each of the requirements of [cessation of operations] and [successors' financial inability] be met."  Plaintiffs' Ex. 1 at 5.  This added language conformed the agreement to the trustees' prior practice of applying both requirements as written in jurisdictions where the Royal Coal and Nobel decisions were not controlling.  The parties also agreed on provisions to minimize the risk that workers might be orphaned without benefits.  The 1993 wage agreement required employers to

promise that coal operations would not be sold or transferred to any successor "without first securing the agreement of the successor to assume the Employer's obligations under this Agreement" and required that an employer who sells or transfers operations to a successor immediately notify UMWA and provide documentation of the successor's assent to its obligation under the 1993 Plan.  Plaintiffs' Ex. 1 at 13.

The UMWA and the Bituminous Coal Operators' Association (BCOA), an organization representing several coal producers, agreed to renegotiate the 1993 agreement before it was set to expire, on August 1, 1998.  The parties agreed that contributions to the plan would be increased from 10¢ to 13¢ per hour worked.  The new rate became effective on January 1, 1998, but non-BCOA employers would not have to pay the higher rate until August 1, 1998.  The parties also added the following sentence to Article XX(c)(3)(ii)(c) -- this became a point of dispute between the trustees:  "An Employer's obligation to contribute at the rates specified in Section (d) must be in effect on the date the Employer is first considered to be 'no longer in business.'" Id.

**The *Apex Minerals* arbitration**

The meaning of this last addition was litigated by the parties before Arbitrator Richard Kasher in In re Apex Minerals. Apex Minerals was a signatory to the 1993 wage agreement and contributed to the 1993 benefits plan.  It ceased operations in

1997 and did not sign the 1998 agreement, but it did not file for bankruptcy until January 2002.  The trustees disagreed about when Apex was "no longer in business" and whether the presence or absence of an "obligation to contribute" on that date affected the eligibility of Apex retirees to receive plan benefits.

The Union Trustees' position was that the "obligation to contribute" language applied only to employers that continued coal mining operations past the August 1, 1998 termination date of the 1993 wage agreement.  They argued that any other interpretation would make the agreement illegal, since the UMWA cannot require an employer to contribute funds to a plan based on hours worked when there are no hours upon which to base the contributions.  The Employer Trustees disagreed, taking the position that the 1998 and subsequent wage agreements operated like insurance policies:  a company that failed to sign a subsequent agreement but stayed "in business" would lose all protection for its retirees under the plan, regardless of the status of its coal mining operations.

Arbitrator Kasher accepted the Union Trustees' position.  He wrote:

> The reliable evidence of record establishes that Apex Minerals was signatory to the 1993 NBCWA and contributed to the 1993 Plan.  Accordingly, Apex met the "obligated to contribute and contributed" requirement in order to establish eligibility for its employees....Based on this history, it is this Arbitrator's finding that Apex Minerals was no longer

> in business, and that the Claimants in this case are entitled to benefits under the terms of the 1993 Plan.

Plaintiffs' Ex. 1 at 12.

**BethEnergy Mines**

BethEnergy Mines was a wholly-owned subsidiary of Bethlehem Steel Corporation. It provided the coal used in Bethlehem's steel manufacturing process. BethEnergy signed and contributed to all UMWA benefit plans from 1974 through 1993.

In August 1996, BethEnergy sold its interest at the Eagle Nest Mine, which it had operated through its subsidiary, Eagle Nest Inc., to Eagle Energy, a company in the A. T. Massey group. Under the terms of the sale, Eagle Energy assumed most of BethEnergy's obligations under the 1993 Plan, but expressly did not assume the obligation to provide health and other non-pension benefits to retirees of the Eagle Nest Mine who did not work for Eagle Energy. Nevertheless, BethEnergy informed the UMWA that "pursuant to the...successorship provisions, [Eagle Energy] has agreed to assume Eagle Nest Inc.'s obligations under the collective bargaining agreement," and stated that 1993 benefit plan's successorship obligation "has been satisfied." Id. at 13.

In October 1997, BethEnergy sold the High Power Mountain Preparation Plant to Power Mountain Coal Co., another company in the A. T. Massey group. That sale likewise included a successorship obligation clause that exempted the buyer from a contractual obligation to provide non-pension benefits to former

employees of the plant, but after the sale, BethEnergy sent a letter to UMWA with a similar blanket statement that its successorship obligations under the 1993 plan had been satisfied.

BethEnergy ceased coal production in 1997.  It did not sign the 1998 or 2002 wage agreements.  On October 15, 2001, Bethlehem Steel and many of its affiliates, including BethEnergy, filed for Chapter 11 bankruptcy.  On May 1, 2003, Bethlehem Steel sold most of its assets to International Steel Group.

**The *BethEnergy* arbitration**

After BethEnergy's bankruptcy and subsequent liquidation, many of its former employees applied for benefits as orphaned retirees.  The Employer and Union trustees deadlocked over whether these retirees were covered by the 1993 Plan.  The parties submitted the dispute to Arbitrator Mark Irvings.  The dispute involved two issues: (1) Was BethEnergy "obligated to contribute" to the 1993 Plan on the date it was first considered to be no longer in business?  (2) Does BethEnergy have successors at the High Power Mountain Preparation Plant and Eagle Nest Mine, such that BethEnergy is not considered to be "no longer in business" regarding the retirees from those locations?

Arbitrator Irvings decided in favor of the Union Trustees on both issues.  With regard to the first issue, Arbitrator Irvings understood the Apex Minerals decision to be precedent binding on the parties unless it was irrational.

Although he allowed for alternate readings of the contractual language than the one applied in Apex, Irvings noted several reasons that supported Arbitrator Kasher's reading of the contract language.  He therefore concluded that BethEnergy did not need to contribute to the 1998 and 2002 plans in order for its retirees to be covered by the 1993 Plan, because it ceased coal mining operations in 1997.

Addressing the second issue, Irvings noted the clarity of the contract language omitting the "no legal obligation" exception to the elements of the "no longer in business" test. He also explained its background, noting the court decisions that had interposed such an exception and the efforts of the negotiating parties to make their intent clear.  Id. at 5. However, Irvings noted, the mechanism designed to ensure that successors voluntarily contracted to provide benefits, namely, the Article I reporting requirements, had not worked in this case.  BethEnergy's notice to UMWA "mischaracterized the reality that the respective asset purchase agreement explicitly carved out one of the obligations of BethEnergy under the collective bargaining agreement, the requirement to provide health benefits to certain of its retirees."  Id. at 30.  The result, that there were successors to BethEnergy at both mine sites, but ones that had no legal obligation to provide benefits, Irvings found unacceptable.  He concluded that it would be "grossly inequitable

to deny coverage to the Eagle Nest and High Power Mountain retirees if they have no way to get Massey to pay for their benefits," and ruled that, unless there is an enforceable obligation on the part of the Massey companies, they are not successors as that term is used in Article XX(c)(3)(ii)(c)(II).

## Analysis

Judicial review of arbitration awards is extremely limited.  Courts "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim."  Steelworkers, 363 U.S. at 567-568.  Their assignment is to ensure that the decision in question "draws its essence" from the contract instead of imposing the arbitrator's "own notions of industrial justice."  Id. at 597.  The question before this court is "not whether the arbitrator...erred in interpreting the contract; it is not whether [he] clearly erred in interpreting the contract; it is not whether [he] grossly erred in interpreting the contract; it is whether [he] interpreted the contract."  International Union of Operating Engineers, Local 139 v. Findorff & Son, Inc., 393 F.3d 742, 745 (7 Cir. 2004) (citations omitted).

### The "obligated to contribute" requirement

In his analysis of the "obligated to contribute" issue, Arbitrator Irvings stated that he was bound by the Apex decision

so long as it was rational.  His stated reason for ascribing precedential value to Apex was Article XX(e)(5) of the 1993 Wage Agreement, which provides:

> [D]ispute[s] shall be referred to a permanent three-member arbitration panel selected by mutual agreement of the UMWA and the BCOA and maintained by the Trustees.  A dispute referred in this manner shall be decided by one member of the arbitration panel, determined on a rotating basis, whose decision shall be final and binding on the parties.  Precedent under the resolution of disputes mechanism previously in place shall remain in effect, and the panel shall be required to cooperate to assure the consistent interpretation of provisions under the Employer Plans under this Article.

Plaintiffs' Ex. 1 at 22.  Irvings interpreted this passage to mean that "the parties have explicitly opted for consistency of interpretation and application, even where a subsequent arbitrator might have a different view of a provision."  Id. at 23.

Irvings's application of Article XX(e)(5) in this context may well have been mistaken.  The parties are in agreement that this article refers to individual employer benefit plans, not multiemployer plans like the 1993 Plan.  From my perspective, however, it is irrelevant whether Arbitrator Irvings correctly interpreted this provision or not.  Arbitrator Irvings's decision to follow Apex was predicated on contractual language.  "[A] court should not reject an award on the ground that the arbitrator misread the contract....[A]s long as the

- 11 -

arbitrator is even arguably construing or applying the contract..., that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987).

Moreover, it is a "truly fundamental principle" that "'the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator'." Hotel Ass'n of Washington, D.C., Inc. v. Hotel & Restaurant Employees Union, Local 25, AFL-CIO, 963 F.2d 388, 390 (D.C. Cir. 1992) (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers, 461 U.S. 757, 765 (1983)). It follows that a second arbitrator must decide whether he is bound by a prior award for himself, by reference to the contract as a whole. Id.; see also Production and Maintenance Employees' Local 504 v. Roadmaster Corp., 916 F.2d 1161, 1162-63 (7th Cir. 1990)("[w]hether more than one arbitrator can take a crack at interpreting the contract is itself a question of contractual interpretation."). Accordingly, even without reference to his explicit interpretation of Article XX(e)(5), I would have no grounds to upset Irvings's conclusion that he was bound by Apex.

Nor are there grounds to overturn Irvings's ultimate conclusion that Apex, and therefore, BethEnergy, was rationally decided in light of the parties' agreement. At its root, the dispute over the "obligated to contribute" provision reflects the

difference between a "literal reading of the sentence," Plaintiffs' Ex. 1 at 25, and a reading that interprets the contract's language in light of the practical realities facing coal companies that, though technically not dissolved, nevertheless have ceased mining operations and therefore have no need to contribute to the plan.  Irvings identified three reasons that undermined a literal reading of the language: (1) the possible illegality of requiring non-operating companies to continue contributing to the plan, (2) the absence of any past collection of contributions from companies that had ceased operations, and (3) the illogic, in light of the "overarching goal" and "purposes of the Plan," Id. at 27, of penalizing retirees of companies that continued to provide benefits for some time after they had ceased operations.  These are legitimate factors to consider in interpreting the contract; none evidences a decision by Irvings to ignore the contractual language based on his own notions of "industrial justice."  Paperworkers, 484 U.S. at 38.

**The "no longer in business" requirement**

In the second part of his BethEnergy decision, Irvings again departed from the literal language of the contract.  This time, however, his decision does not "draw[] its essence" from the contract, and it cannot be explained except as an expression of non-contractual notions of "industrial justice."  Id.

The only reason given by Irvings for his conclusion that the Massey companies were not successors under the "no longer in business" criteria was that "it would be grossly inequitable to deny coverage to the Eagle Nest and High Power Mountain retirees if they have no way to get Massey to pay for their benefits." Id. at 30.  This equitable consideration led Irvings to disavow "the [successorship] analysis traditionally performed and enforced by the 1993 Plan...." Id.  It also led him to adopt an "enforceable obligation" requirement, id. at 31, that is indistinguishable from the "legal obligation" requirement imposed by the Royal Coal and Nobel decisions.  But the tying of successorship to a "legal" or "enforceable" obligation on the part of the successor was plainly rejected by language added to the 1993 agreement that unambiguously expresses the intention of the contracting parties that no such requirement should be imposed.  In light of the well-documented history of the effect of the Royal Coal and Nobel decisions on the solvency of earlier plans, and the explicit rejection of the "legal obligation" requirement for successorship by the parties in the 1993 Plan, there is no basis to conclude that Irvings was interpreting the contract when he resurrected an "enforceable obligation" requirement.[2]  His decision to extend the 1993 Plan's benefits to

---

[2] I note, but because the arbitration decision in question is functus officio, decline to rely upon, the Employer Trustees' citation to Arbitrator Irvings's later decision in In re Talon

the Eagle Nest and High Power Mountain retirees did not "draw[] its essence" not from the contract, and had to be vacated.


                                        JAMES ROBERTSON
                                    United States District Judge

---

Resources:

>   [I]f the [successorship] language is read as imposing a
>   general requirement of a legally enforceable obligation
>   on the "no longer in business test," it would be wholly
>   irrational and would not be based on the explicit terms
>   of the contract....Although inartfully expressed,
>   BethEnergy was essentially decided on principles of
>   equitable estoppel....Given the underlying purpose of
>   the 1993 Plan of providing benefits for "orphans," I
>   concluded that it would be inequitable to leave the
>   retirees without coverage where this gap could and
>   should have been avoided.

Plaintiffs' Ex. 2 at 21-22.